# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

World College of Refractive Surgery and Visual
Sciences, Inc., Dr. Arthur Cummings, Dr.
Charles Williamson, Dr. Osama Ibrahim, Dr. Ik     NO.
Hee Ryu, Dr. Francesco Carones, and Dr. Dan
Reinstein.

       Plaintiffs,

VERSUS

Dr. Guy Kezirian,

      Defendant.

## COMPLAINT OF WORLD COLLEGE OF REFRACTIVE SURGERY, DR. ARTHUR CUMMINGS, DR. CHARLES WILLIAMSON, DR. OSAMA IBRAHIM, DR. IK HEE RYU, DR. FRANCESCO CARONES, AND DR. DAN REINSTEIN

Pursuant to the Federal Rules of Civil Procedure, Plaintiffs respectfully submit this "Complaint," representing as follows:

## Parties

## 1.

The Plaintiffs in this matter are:

    a.  World College of Refractive Surgery and Visual Sciences, Inc. ("WCRS"), a Delaware public benefit corporation with a principal place of business located in Baton Rouge, Louisiana.

    b.  Dr. Arthur Cummings in his individual capacity and official capacity as board member of WCRS;

    c.  Dr. Charles Williamson in his individual capacity and official capacity as board member of WCRS;

    d.  Dr. Osama Ibrahim in his individual capacity and official capacity as board

member of WCRS;

    e.   Dr. Ik Hee Ryu in his individual capacity and official capacity as board member of WCRS;

    f.   Dr. Francesco Carones in his individual capacity and official capacity as board member of WCRS;

    g.   Dr. Dan Reinstein in his individual capacity and official capacity as board member of WCRS.

Dr. Arthur Cummings, Dr. Charles Williamson, Dr. Osama Ibrahim, Dr. Ik Hee Ryu, Dr. Francesco Carones, and Dr. Dan Reinstein in their individual capacities are herein sometimes referred to as the "Plaintiff Visionaries." Collectively, the WCRS and the Plaintiff Visionaries are sometimes referred to as "Plaintiffs."

**2.**

The Defendants in this matter is Dr. Guy Kezirian ("Kezirian"), a citizen of Arizona with a principal residence located at 28071 North 90th Way, Scottsdale, Arizona 85262, Dr. Kezirian is named in his individual capacity.

**Jurisdiction and Venue**

**3.**

This Court has jurisdiction to consider this action pursuant to 28 U.S.C. § 1332(a)(3), the federal diversity jurisdiction statute. The parties are completely diverse, as in that this is a civil action between Plaintiffs, who are citizens of Louisiana, Delaware, the United Kingdom, South Korea, Egypt, Italy, and Ireland, and Defendant, who is a citizen of Arizona. The amount in controversy exceeds $75,000, exclusive of interest and costs.

**4.**

At issue in this matter, first and foremost, is a request for declaratory judgment that Dr. Kezirian does not own any stock in the WCRS nor does he hold a promissory note payable to him by the WCRS. A declaratory judgment on these issues is necessary to allow WCRS to both protect its shareholders and its own interests and to allow WCRS to pursue its ultimate goal of forming an independent credentialing system for refractive surgeons as a separate specialty. The particular event that precipitated this lawsuit is Dr. Kezirian's recent claim during the course of a financial audit of the WCRS in May of 2024 that he purchased 610,000 shares of Class B stock in the WCRS for only $10,000, and that he holds a promissory note payable by the WCRS for $90,000 with interest. The shares claimed by Dr. Kezirian would be worth $6,100,000 based on the price of $10 per share that was approved by the Visionary Group and that every investor other than Dr. Kezirian paid. For jurisdictional purposes, the amount in controversy thus far exceeds the $75,000 statutory minimum. *See Frye v. Anadarko Petroleum Corp.*, 953 F.3d 285, 293 (5th Cir. 2019) ("In actions seeking declaratory or injunctive relief, it is well established that the amount in controversy is measured by the value of the object of the litigation.").

**5.**

Venue for this dispute is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2). In particular, this lawsuit concerns a determination of the ownership of the stock of WCRS, which is a citizen of and has its principal place of business in Louisiana and whose only United States based director, Dr. Williamson, is also a citizen of Louisiana.

**6.**

Under Louisiana's long-arm statute, courts are permitted to exercise personal jurisdiction over non-residents consistent with the Louisiana State Constitution and the Due Process Clause of the Fourteenth Amendment to the United States Constitution. U.S. Const. Amend. 14; La. Const. art. 1, § 2; La. R.S. § 13:3201(B). A court's exercise of personal jurisdiction over a non-resident

defendant comports with due process when "(1) that defendant has purposefully availed himself of the benefits and protections of the forum state by establishing minimum contacts with the forum state, and (2) the exercise of jurisdiction over that defendant does not offend traditional notions of fair play and substantial justice." *Deep S. Commc'ns, LLC v. Fellegy*, 652 F. Supp. 3d 636, 652 (M.D. La. 2023)(citing *Panda Brandywine Corp. v. Potomac Elec. Power Co*., 253 F.3d 865, 867 (5th Cir. 2001)). The Fifth Circuit has articulated a three-step analysis for the specific jurisdiction inquiry: (1) if the defendant has minimum contacts with the forum state; (2) whether the plaintiff's cause of action arises out of or results from the defendant's forum-related contacts; and (3) "[i]f the plaintiff successfully satisfies the first two prongs, the burden shifts to the defendant to defeat jurisdiction by showing that its exercise would be unfair or unreasonable." *Deep S. Commc'ns, LLC v. Fellegy*, 652 F. Supp. 3d 636, 652 (M.D. La. 2023)(citing *Seiferth v. Helicopteros Atuneros, Inc*., 472 F.3d 266, 271 (5th Cir. 2006)). Dr. Guy Kezirian is subject to personal jurisdiction in Louisiana because he has minimum contacts with the state; he issued a private placement memorandum to shareholders in Louisiana, specifically to Dr. Williamson, thus availing himself of the laws of Louisiana in raising capital in the first years of the WCRS. This case arises directly from Dr. Kezirian's actions in the State of Louisiana. Finally, the exercise of jurisdiction would be fair and reasonable.

**7.**

In the alternative, Plaintiffs also bring claims under: Section 10(b) of the Exchange Act (15 U.S.C. §78j(b)) and the regulations promulgated thereunder including but not limited to Rule 10b-5 of the Securities Exchange Commission ("SEC") at 17 C.F.R §240.10b-5; Delaware General Corporate Law; and Delaware Common Law.

**8.**

This Court has jurisdiction over the claims under Section 10(b) of the Exchange Act and

corresponding regulations pursuant to 28 U.S.C. § 1331, the federal question jurisdiction statute, and §1337 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

**9.**

This court has diversity jurisdiction over all state law claims asserted herein. In the event this Court finds that there is no diversity jurisdiction, this Court may exercise supplemental jurisdiction over the state law claims asserted herein, including but not limited to the claims for detrimental reliance, unjust enrichment, breach of fiduciary duty, and fraud, as these claims arise under the same case and controversy as the federal claims under the Exchange Act and the Securities Act. 28 U.S.C. §1367(a).

**10.**

Venue is proper in this district under Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)), and 28 U.S.C. § 1391(b). Securities Exchange Act's venue provision authorizes bringing a securities fraud suit in any district where (1) "any act or transaction constituting the violation [of the Act] occurred"; (2) the defendant is "found"; (3) the defendant is an "inhabitant"; or (4) the defendant "transacts any business." See 15 U.S.C. 78aa. A substantial part of the events or omissions giving rise to the fraud or the effects of the fraud occurred in this district. Further, venue is proper under 28 U.S.C. § 1391(b)(3) in that Defendant is subject to personal jurisdiction in this district, as Dr. Guy Kezirian has minimum contacts with the state because he issued a private placement memorandum to shareholders in Louisiana, thus availing himself of the laws of Louisiana in raising capital in the first years of the WCRS. Further, this case arises directly from Dr. Kezirian's actions in the State of Louisiana, and the exercise of jurisdiction would be fair and reasonable.

**11.**

In connection with the acts, transactions, and conduct alleged herein, Defendant directly

and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## BACKGROUND

### 12.

This case revolves around the actions of Dr. Guy Kezirian, who during the course of a routine financial audit of the WCRS attempted to improperly claim ownership of a majority interest of Class B stock in the WCRS and a $90,000 promissory note payable by the WCRS, causing the company to cease raising capital and cease operations until the veracity of this claim could be determined as his claim has serious implications under Federal and state securities laws. The financial audit concluded that there is no evidence that Dr. Kezirian ever paid for any stock, nor did he execute any writing transferring any stock to him from the WCRS. Further, the financial audit concluded that there is no evidence of an executed promissory note payable to Dr. Kezirian in the amount of $90,000 with interest. The Board of Directors of WCRS accordingly issued a resolution that based on the results of the investigation, Dr. Kezirian does not own any stock in the WCRS nor does he own any debt instruments payable by the WCRS.

### 13.

The Plaintiffs are seeking first and foremost a declaratory judgment declaring Dr. Kezirian does not own any stock in the WCRS. In the alternative, Plaintiffs are seeking damages and equitable relief based on Dr. Kezirian's actions, which constituted fraud, violation of federal and state securities laws, breach of duty of care, breach of loyalty, and breach of fiduciary duty under federal and state law.

**The Beginnings of the World College of Refractive Surgery**

**14.**

The WCRS was created to fulfill the need for an independent credentialing and peer review service for surgeons specializing in the field of refractive surgery. By way of background, the American Society of Cataract & Refractive Surgery (ASCRS) was formed in 1975. The ASCRS provided representation for refractive surgeons, who until then were largely considered general ophthalmologists. In 1991, the European Society of Cataract and Refractive Surgeons (ESCRS) was established and today has 7,000 members from 139 countries. Refractive surgery is regularly featured in Specialty Day at the American Academy of Ophthalmology, further solidifying its status as a recognized specialty separate and apart from general ophthalmology. The Refractive Surgery Alliance ("RSA") was founded in 2014 and is an organization dedicated to the advancement of refractive surgery. However, the RSA does not provide credentialing or certification services of any kind, nor does it provide peer review of surgeons in the field of refractive surgery.

**15.**

On or about February 25, 2019, Dr. Charles Williamson posted an essay on the Refractive Alliance Forum ("RAF"), an online forum provided by the RSA where doctors of refractive surgery can discuss topics relevant to the field of refractive surgery. Therein, Dr. Williamson provided a detailed analysis of why Refractive Surgery should become a "full-fledged Medical Specialty" separate and apart from general ophthalmology due to the significant developments in technology, differences in training, and other reasons. *See Exhibit 2*. This essay sparked what would become a years-long collaboration among a group of leading figures in the field of eye surgery who shared a vision to establish an organization to govern the medical specialty of refractive surgery, separate from the RSA, ASCRS, ESCRS, or any organization that had come

before. *See Exhibit 2.* On March 31, 2019, Dr. Jeffrey Robin of the RSA executive committee responded to Dr. Williamson's February 2019 essay in another RAF post, stating that he and other individuals sitting on the RSA executive committee were also interested in the concept of a separate medical specialty for refractive surgery and were working on the initial development of an independent certifying "College of Refractive Surgery." *See Exhibit 2.* Dr. Williamson responded to Dr. Robin's post, affirming his commitment to the idea of an independent credentialing authority. *See Exhibit 2.*

**16.**

Following these discussions, in July of 2019, Dr. Charles Williamson emailed a large group of refractive surgery specialists,[1] outlining his upcoming presentations at the American European Congress of Ophthalmic Surgery and the Southern Eye Conference. Therein, Dr. Williamson proposed the establishment of a College of Refractive and Vision Surgery (CRVS), rather than a College of Refractive Surgery as had been proposed by the executive committee of the RSA, to encompass a broader range of surgical techniques and innovations beyond traditional refractive procedures, including nano surgery and other forms of vision surgery. Dr. Williamson also outlined a strategy to ensure inclusivity, collaboration, and differentiation within the CRVS, with separate pathways for certification and continued education for MDs, ODs, administrators, and technicians. Dr. Williamson invited feedback and emphasized the need for unity and ethical leadership within the global community of ophthalmology while embracing new frontiers in vision

---

[1] Recipients included: Aaron Waite, Arthur Cummings, Baseer Khan, Blake Williamson, Dan Reinstein, Daniel Durrie, Edith Lange, Evan Schoenberg, Erik Mertens, Greg Parkhurst, Guillermo Rocha, Guy Kezirian, Helen Wu, Jason Stahl, Jeff Robin, Jennifer Loh, Julie Schallhorn, Lance Kugler, Luke Rebenitsch, Mark Schneider, Matthias Maus, Michael Mrochen, Nicole Lemanski, Rex Hamilton, Roger Zaldivar, Vance Thompson, William Trattler, William Wiley, and Wolfgang Riha. *See Exhibit 4.*

surgery. *See Exhibit 4.*

**17.**

From 2019 to 2021, Dr. Williamson worked with a group of ophthalmologists from all over the world, including but not limited to Dr. Kezirian, Dr. Cummings, and the current board members of the WCRS, to create the organization Dr. Williamson had proposed to establish. This organization would eventually become the WCRS. The focus of the WCRS was not on establishing refractive surgery as a specialty (this idea was already widely accepted) but rather on creating a credentialing system through agreed internationally recognized standards for education and training in refractive surgery.

**18.**

This international group of ophthalmologists referred to themselves as the Visionary Group (or "Visionaries").  Plaintiff Visionaries, Dr. Arthur Cummings, Dr. Charles Williamson, Dr. Osama Ibrahim, Dr. Ik Hee Ryu, Dr. Francesco Carones, and Dr. Dan Reinstein were each members of the Visionary Group. The Visionary Group had no single leader and all decisions regarding the creation of the WCRS were made collectively among the members of the group. For the avoidance of doubt, Dr. Kezirian was never considered the leader of the group or the originator of the idea of the WCRS. The Visionary Group members, including the Plaintiff Visionaries, volunteered their time and worked tirelessly, in a collaborative fashion, from early 2019 through 2021 to create the WCRS.

**19.**

On February 26, 2021, Dr. Williamson sent a formal narrative proposal for the World College of Refractive Surgery to Dr. Kezirian. At this time Dr. Guy Kezirian was considered a friend and trusted colleague of the other Visionaries. He offered to host virtual meetings for the Visionaries and helped organize the group administratively, but by no means did he act alone or

as the primary leader of the Visionary Group.  To the contrary, Dr. Williamson and Dr. Cummings performed a large portion of the early leadership duties by organizing and assigning tasks to members of the group.

### 20.

In March of 2021, Dr. Williamson sent an outline of a proposed structure and operational guidelines for the WCRS to the Visionary Group for their consideration. In April 2021, the Visionary Group voted to move forward with the formal creation of a company. On April 3, 2021, Dr. Williamson created a comprehensive task list to launch the company. *Exhibit 3.*  Dr. Cummings modified the list and then he strategically assigned the tasks to individual Visionary Group members to ensure efficiency and progress. *Exhibit 3.*

### 21.

Throughout this process, the Visionaries appeared unified in their goal to elevate the standards of refractive surgery globally, to expand the number of qualified refractive surgeons, and to provide credentialing for healthcare professionals in this field. Each member of the group donated time, expertise, and resources freely to support this collective mission with the understanding that they were creating something together as equals. It was a shared endeavor, one built on trust and mutual respect. At all times, the Visionaries acted as a group and no single person was the leader. Decisions were made collectively among the members of the group, normally by simple vote.

### 22.

Dr. Cummings assigned Dr. Williamson the task of developing the WCRS company's goals, mission statements, and investor pitch. He crafted the operational structure of decentralized regional governance. He created the certification programs for collaborative healthcare personnel, educational programs for residents in training, onboarding processes for Refractive Surgery

Fellows, and established the guidelines for all credentialing, certification, and accreditation. Additionally, Dr. Williamson designed all the marketing materials and campaigns, developed the corporate logo, and even led the democratic process in naming the company itself. *See Exhibit 3.* Specifically, Dr. Williamson recommended to the Visionary Group to change the name of the company to the World College of Refractive Surgery and Visual Sciences (WCRS) in order to expand the scope and inclusiveness of its mission. In May 2021, the Visionary Group voted to adopt his suggestion and change the name the company to the WCRS.

**23.**

In carrying out his assigned tasks, Dr. Williamson would develop these initiatives and then consult with Dr. Arthur Cummings and Dr. Francesco Carones as a de-facto executive committee to help refine them. These essential elements were then reviewed, refined, modified and approved by the entire Visionary Group, who would later serve as the Board of Directors for WCRS. None of these programs or initiatives were developed by Guy Kezirian.

**24.**

Dr. Cummings had assigned Dr. Guy Kezirian the task of acting as an agent on behalf of the Visionary Group, to complete the legal requirements necessary to incorporate the WCRS. In short, Dr. Kezirian was entrusted with representing the interests of the Visionary Group to the attorneys handling the organization of WCRS, including but not limited to incorporating the company and drafting the Private Placement Memorandum. Dr. Kezirian's assigned role was critical and demanded trust, as it involved establishing the legal foundation for the entire enterprise. *See Exhibit 3.*

**25.**

On April 4, 2021, Dr. Kezirian acknowledged the task list and assignments that had been created by Dr. Williamson and Dr. Cummings. Dr. Kezirian's acknowledgement and acceptance

of his role was prior to him contacting the attorneys who drafted the documents to incorporate the WCRS.

## 26.

The Visionaries held several meetings in early 2021, which were recorded on Zoom and stored in a Dropbox folder maintained by Dr. Kezirian. Plaintiffs no longer have access to this Dropbox. Prior to incorporation of the WCRS the Visionaries had decided during these meetings, as a group, two central aspects of the company: first, that the Visionary Group would form the Board of Directors of the company, and second, that the initial investment offering for the Trustee class of stock (Class B stock) should be valued at $10 per share with investments capped at a maximum of $250,000 for a single shareholder. These aspects were consistent with the agreement amongst the Visionary Group that the WCRS would be a collaborative venture that was not controlled by a single member of the group, nor by a single shareholder. Dr. Kezirian acknowledged the Visionary Group's decision that he would be acting as an agent of the group when dealing with the attorneys who would incorporate the WCRS and he agreed that the WCRS would be a collaborative endeavor where all Visionary Group members would have an equal opportunity to purchase shares of Class B stock in the company at the price of $10 per share with a maximum investment of $250,000 for a single shareholder.

## 27.

Believing that Dr. Kezirian was representing the interests of the Visionary Group in communicating with Greenberg Traurig, the law firm that had been hired to represent WCRS, to formally incorporate the WCRS, the other Visionaries worked to carry on the critical substantive work of starting the WCRS, including creating detailed mission statements, plans for education and credentialing of refractive surgeons, and the like. However, rather than fulfilling this responsibility in the manner the Visionaries had decided as a group, Dr. Kezirian betrayed his

colleagues and embarked on a deliberate scheme to seize control of WCRS for his own personal gain. As described below, despite that he had been assigned the duty to incorporate the company Dr. Kezirian falsely represented himself to the law firm as the sole creator and developer of the WCRS and took steps to secretly acquire a majority of the company's shares—all while keeping his colleagues and partners in the dark.

### The Formation of WCRS

### 28.

On Friday, July 2, 2021, the WCRS was incorporated by Kathleen "Katie" Saucier, an attorney at the law firm of Greenberg Traurig, LLP, at the direction of Dr. Kezirian. *Exhibit 5.* Unbeknownst to Plaintiffs, Dr. Kezirian had represented to the law firm Greenberg Traurig that he was the sole owner and creator of the WCRS, and instructed Ms. Saucier to add only himself as the inaugural board member via an instrument executed on the very same day. *See Exhibit 6.* This was completely contrary to what had been agreed on by the Visionaries; that is, that the Visionary Group would form the board of directors.

### 29.

Dr. Kezirian represented to the other members of the Visionary Group that on July 2, 2021, the WCRS had been incorporated, and nothing in the Certificate of Incorporation filed with the Secretary of State of Delaware as a public document indicated that Dr. Kezirian had done anything wrong. The Certificate of Incorporation authorized WCRS to issue 1,200,000 shares of stock total, of which 1,000,000 shares were Class B stock, 100,000 shares were Class A stock, and 100,000 shares were Class C stock. *Exhibit 5.* The Visionaries' understanding based on Dr. Kezirian's representations and on the agreement of the Visionary Group was that the Visionary Group's term as the Board of the WCRS was to begin sometime after the incorporation. Dr. Kezirian did not provide the Resolution of the Sole Incorporator to the other Visionaries at any time, and this

document was obtained only upon obtaining the WCRS client file from Greenberg Traurig in 2024 after a routine audit raised questions about Dr. Kezirian's stock ownership. At no time before the 2024 financial audit did the Plaintiffs or other Visionaries realize that Dr. Kezirian had made himself the sole board member of the WCRS for any length of time.  *See Exhibit 7, Affidavit of Dr. Charles Williamson; Exhibit 8, Affidavit of Dr. Arthur Cummings.*

**30.**

On July 2, 2021, as the sole board member according to the Resolution of the Sole Incorporator, Dr. Kezirian then executed a second secret document, the Organizational Consent of the Board document (*Exhibit 1*) which he deliberately concealed from the rest of the Board for years. Critically, Dr. Kezirian did not at any point prior to or concurrent with the issuance of the August 14, 2021, Private Placement Memorandum for Trustee (Class B) Stock (*Exhibit 10*) or the August 14, 2021, Private Placement Memorandum for Founder (Class A) Stock disclose the Organizational Consent or indicate that he purportedly owned 610,000 shares of Class B stock.

**31.**

In the Organizational Consent, which was signed only by Kezirian himself, he purportedly granted himself an option to purchase 610,000 shares of Class B stock (51 % of the company) for only $10,000—a price of just $0.016 per share. *Exhibit 1*. This share price was steeply discounted compared to the $10 per share price that the Visionaries had agreed upon, and this option was extended by Dr. Kezirian to himself without the knowledge of the rest of the WCRS investors, who believed the Visionaries, including Dr. Kezirian, would all be offered the same investment opportunity to purchase shares of Class B stock at $10 per share. The Organizational Consent document was then kept hidden by Dr. Kezirian and was not disclosed to Plaintiffs or any investors in either of the Private Placement Memorandums for Class B and Class A stock that were later issued on August 14, 2021.

**32.**

In order to maintain his deception, Dr. Kezirian realized he needed to "appear" as though he was participating in the planned capital stock offering like the other Trustee investors, who intended to invest a minimum of $100,000 at $10 per share of Class B stock based on the agreement of the Visionaries, so as not reveal any potential deception and to avoid any questions that would come from him allegedly depositing only the reduced price of $10,000 that he intended to pay. Thus, on July 6, 2021, Dr. Kezirian represented to the Visionaries that he had deposited $100,000 into the WCRS bank account.

**33.**

To the Visionaries, the deposit on July 6, 2021 seemed to align with their agreement that each Visionary would invest $100,000 for 10,000 shares of Class B stock at a price of $10 per share. At this point, the Visionaries, including Plaintiffs, had no idea that Dr. Kezirian had executed the Organizational Consent document purporting to grant him an option to buy a majority interest in the company for a deeply discounted price from what had been agreed upon as a group. Thus, they continued to believe that Dr. Kezirian was acting in accordance with the decisions the Visionaries had made as a group regarding stock prices and other aspects of the organization of the WCRS.

**34.**

However, documents recovered from Greenberg Traurig, LLP, during the course of the 2024 audit revealed that on July 8, 2021, Dr. Kezirian privately instructed the law firm that although he purportedly funded $100,000 he only wanted $10,000 listed as his capital contribution. *See Exhibit 9 "Emails between Dr. Kezirian and Greenberg Traurig"*. He directed the law firm to prepare a convertible note agreement for the other $90,000 of this deposit be treated as a loan to the WCRS that would provide him with an 8.5% return and a 15% preference on conversion.

*See Exhibit 11 "Draft Side Letter"; Exhibit 12- "Draft Convertible Note"*. All of this was done without the knowledge of Plaintiffs or any of the other Visionaries or later investors. In fact, in the Private Placement Memorandums issued by Dr. Kezirian on August 14, 2021, he stated unequivocally that the company had "No debt." *Exhibit 10*. Thus, his deception continued.

**35.**

Dr. Kezirian's alleged 610,000 shares of Class B stock, purportedly acquired for just $10,000, would later be valued at $6,100,000 based on the $10 per share price paid by all other investors. To conceal the true value of this capital stock on subsequent tax returns, Dr. Kezirian, in an email dated June 8, 2022, attached here as Exhibit 9, instructed Greenberg Traurig, LLP, to draft a side letter allowing him to report the economic value of only 10,000 shares until December 31, 2024. This would effectively hide the true value of his 610,000 shares he is now attempting to claim in tax filings until the 2025 tax returns that would have been filed in April 2026: i.e. long after the other Board members' terms had expired.

**36.**

Dr. Kezirian intended to conceal and did in fact conceal his secret stock option for years. Dr. Kezirian went to extreme lengths to conceal the Organizational Consent and its contents from the Plaintiffs. Not only did he not share this document with anyone prior to or concurrent with the issuance of the August 14, 2021, private placement memorandums, he also later took actions to continue to keep the Organizational Consent concealed. Specifically, Dr. Kezirian falsely titled the Organizational Consent as "IRS 501c6" before putting it anywhere where his colleagues might have had access to it, and never directly told any of the Plaintiffs or other investors of its existence.

**37.**

With Dr. Kezirian's secret organizational consent documents, promissory note, and side letter remaining undiscovered, Dr. Kezirian created the false appearance that he had invested

$100,000, seemingly aligning with the other Trustee investors. This could have effectively delayed the discovery of his majority ownership for years, as long as these documents and the side letter remained concealed. But for the financial audit undertaken in early 2024, these documents would still be hidden and the WCRS shareholders and board members would not know of Dr. Kezirian's actions taken to attempt to secretly acquire a majority interest in the WCRS at a discount of approximately 625 times less than what the other investors paid just a month later.

**Misrepresentations in the Private Placement Memorandum**

**38.**

Not only did Dr. Kezirian conceal the Organizational Consent and other documents that would have shown his claimed majority ownership (i.e. the promissory note and the side letter). To hide his secret alleged majority ownership, he deliberately omitted crucial information from the two August 14, 2021 Private Placement Memorandums (PPMs) for Trustee and Founder stock, respectively, and made several material misstatements in these stock offerings. In doing so, he knowingly engaged in securities fraud, manipulating public records to prevent the discovery of his secret alleged stock holdings.

**39.**

The WCRS Certificate of Incorporation authorized a total of 1,200,000 shares, divided into 1,000,000 Class B (Trustee) shares, 100,000 Class A (Founder) shares, and 100,000 Class C shares. *Exhibit 5.* Dr. Kezirian was the primary author of the Trustee (Class B) and Founder (Class A) Private Placement Memorandums in August 2021. In these documents, he did not disclose the existence of the option in the Organizational Consent nor did he disclose his alleged ownership of the 610,000 shares of Class B stock through his exercise of the option. As detailed below, Dr. Kezirian both omitted material information and made affirmative false statements in the PPMs which effectively disguised his claimed majority ownership.

**40.**

The August 14, 2021, Trustee Private Placement Memorandum (Trustee PPM) purported to offer 500,000 Class B Trustee shares at $10 per share.  If Dr. Kezirian had already granted himself 610,000 Class B shares (a majority of the total shares) as he later claimed, then it would have been impossible to offer 500,000 shares in the stock raise, as only 390,000 Class B shares would have remained. On Page 16 of the Trustee Private Placement Memorandum, under the section "Securities Offered," it states that 500,000 of Trustee Class Shares (Class B) was for sale or up to Five Million Dollars ($5,000,000) worth at $10 per share in the Company. This statement, which was made on August 14, 2021, would be materially false if Dr. Kezirian had purchased 610,000 shares on July 6, 2021, out of the 1,000,000 Class B Shares available. *Exhibit 10; see also Exhibit 5.* If he had truly purchased 610,000 shares of Class B stock on July 6, 2021, then Dr. Kezirian made this false statement in the Trustee PPM in full knowledge that it was false, made this statement against the interests of the WCRS, and made this statement with the intent to deceive the other investors in the WCRS.

**41.**

Further, on Page 16 of the Trustee PPM, under the "Shares Outstanding" section Dr. Kezirian stated: "The Company's capital **currently** consists of 100,000 outstanding Trustee Class shares." *Exhibit 10 (emphasis added).* This would be materially false if Dr. Kezirian, as he later claimed, had purchased 610,000 shares out of the 1,000,000 Class B Shares on July 6, 2021 (the date of the deposit he claims was from him for the $10,000 purchase of stock and also the $90,000 promissory note). Exhibit 10. Again, if he had truly purchased 610,000 shares of Class B stock on July 6, 2021, then Dr. Kezirian made this false statement in the Trustee PPM in full knowledge that it was false, made this statement against the interests of the WCRS, and made this statement with the intent to deceive the other investors in the WCRS.

**42.**

In addition to stating that only 100,000 shares of stock were outstanding, on page 1 of the Trustee PPM, it states that "As of the date of this memorandum (August 14, 2021) the Company has accepted pledges for $650,000 for 65,000 shares in the US offering of Trustee Stock (Class B)"? *Exhibit 10* at p. 1. Accordingly, if Dr. Kezirian had owned or had intended to purchase 610,000 shares of stock, then these statements gave the false impression that only 165,000 shares of stock were owned or intended to be owned in the near future. This misleading statement was made purposefully by Dr. Kezirian to conceal his attempted secret acquisition of 610,000 shares of stock for a deeply discounted price.

**43.**

The Trustee PPM further stated that as of August 14, 2021, "The following individuals have either pledged or funded into the Trustee Offering, which requires a USD 100,000 minimal investment: Arthur Cummings, Daniel Durrie, Osama Ibrahim, Guy M. Kezirian, Dan Reinstein, Erik Mertens, Aaron Waite, Charles Williamson, Roger Zaldivar" *Exhibit 10* at p. 42. If Dr. Kezirian had purchased 610,000 shares of Class B stock for only $10,000, then this statement would also be materially false. This misleading statement was made purposefully by Dr. Kezirian to conceal his attempted secret acquisition of 610,000 shares of stock for a deeply discounted price.

**44.**

Finally, Dr. Kezirian also concealed the existence of the purported $90,000 promissory note in the Trustee PPM. "The World College of Refractive Surgery & Visual Sciences, PBC was formed in July 2021 and has no substantial operating history and no debt." *Exhibit 10* at p.39. If Dr. Kezirian held a $90,000 promissory note based on the $100,000 deposit made on July 6, 2021, allegedly by Dr. Kezirian, then the statement that the WCRS had no debt would be materially false as well, and this statement was made with the intent to deceive the other investors and hide Dr.

Kezirian's true intent to purchase 610,000 shares at a deep discount.

**45.**

Upon information and belief, the Founders PPM, also dated August 14, 2021, contained similar incorrect statements regarding (1) the shares outstanding, (2) the pledges accepted, and (3) the debt of the company.

**Concealment for years of the fraud**

**46.**

From 2021 until 2024, Dr. Kezirian handled the taxes and accounting for the WCRS and was the sole signatory on the bank account until June of 2024, when he closed the bank account and transferred the funds to a new account. Later, Plaintiffs would realize that by closing the account, Dr. Kezirian had prevented them from obtaining proof of Dr. Kezirian's alleged July 6, 2021 deposit. Upon information and belief, on the tax returns that he filed during this time both for the WCRS and for himself individually, he did not represent that he owned 610,000 shares of stock, but rather represented where applicable that he held only 10,000 shares of stock. Accordingly, at no point did any of these documents, to the extent they might have been available to Plaintiffs, alert them to Dr. Kezirian's deception.

**47.**

Moreover, from 2021 until 2024, when Dr. Kezirian would cast votes as a shareholder, he counted his votes as an owner of 10,000 shares of stock, not as a majority shareholder. Accordingly, at no point did Dr. Kezirian's participation in the WCRS as a shareholder alert the Plaintiffs that he claimed to own 610,000 shares of Class B stock.

**48.**

Dr. Kezirian never took any actions or made any representations prior to 2024 that would have alerted Plaintiffs to his claim that he owned 610,000 shares of Class B stock, nor to his claim

that he held a promissory note in the amount of $90,000.

### Discovery of the Fraud through a Routine Audit

#### 49.

Dr. Kezirian's scheme finally came to light in early 2024 when the WCRS Board hired Certified Public Accountant to conduct a full, independent third-party audit of WCRS's financial statements, over Dr. Kezirian's strong objections. *See Exhibit 7.* On or about April 10, 2024, Lawrence A. Vollaro with the accounting firm Lehman Flynn Vollaro CPA's PLLC, was hired by the WCRS to provide an opinion as to the financial statements of the company and to help with the preparation of an audit report for the 2023 fiscal year. During this comprehensive investigation, Mr. Vollaro uncovered the Organizational Consent document that Dr. Kezirian had consistently concealed for the past three years.

#### 50.

In conducting his audit, Mr. Vollaro requested several documents, including bank records, QuickBooks data, and other documents, and had an initial phone call with Dr. Kezirian, who was handling the bookkeeping at the time the review commenced in April of 2024. On or about April 29, 2024, Dr. Kezirian sent Mr. Vollaro an email with the minutes from the four quarterly board meetings in 2023, a word document and excel document regarding the QuickBooks reconciliation. However, Dr. Kezirian did not provide all of the necessary documents and Mr. Vollaro requested follow up documentation.

#### 51.

In examining the accounts receivable for the WCRS, Mr. Vollaro discovered that most of the items in this category were unfunded subscriptions for stock; thus, he examined the capital stock spreadsheet and commenced to reconcile the funded and unfunded subscriptions with the

company's QuickBooks data. Mr. Vollaro quickly noticed that the capital stock positions did not tie out, and he requested follow up information from Dr. Kezirian to clarify. Dr. Kezirian then represented to Mr. Vollaro that he owned 610,000 shares of stock, which had been purchased for $10,000. Mr. Vollaro requested documentation, such as a subscription agreement, stock certificate, or the like, to evidence this ownership and requested documentation that any subscription had been funded. Mr. Vollaro had required the same information for all stock positions.

**52.**

Instead of providing the requested documentation, Dr. Kezirian told Mr. Vollaro that on July 2, 2021, he executed a document that would allow him to acquire 610,000 shares of WCRS stock for just $10,000.00, and provided a copy of the document (the "Organizational Consent"). Dr. Kezirian claimed to have exercised this option on July 6, 2021, and thus was the owner of 610,000 shares of Class B Stock. However, Dr. Kezirian still did not provide the requested documentation, such as a subscription agreement, stock certificate, or the like, to evidence this ownership, nor did he provide documentation showing that his purported stock purchase had been funded.

**53.**

Sometime in May 2024, Mr. Vollaro informed the WCRS Board that Dr. Kezirian claimed to have executed the Organizational Consent and later exercised this option, but also that Dr. Kezirian had not provided any subscription agreement, stock certificate, or other writing to evidence his exercise of the option. Further, Dr. Kezirian claims to have deposited the $10,000 for his stock on July 6, 2021, in connection with the exercise of this option. There is no $10,000 transaction on July 6, 2021, but there was a deposit of $100,000 made on July 6, 2021. However, the bank statements do not show any information establishing the identity of the payor of the funds deposited on July 6, 2021, to the WCRS account.

**54.**

Rather than simply provide the voided check or other bank record evidencing the identity of the payor of the July 6, 2021 deposit, Dr. Kezirian resigned from the board and closed the WCRS bank account and later claimed he could not access the bank records because the account was closed. The WCRS contacted the financial institution to request the required documentation, but the financial institution declined to provide the records because only Dr. Kezirian had been a signor on the account. In an erratic proclamation in a Letter dated June 4, 2024, Dr. Kezirian claimed to have deposited $110,000. *Exhibit 14.* Likewise, there is absolutely no proof of such an event.

**55.**

Dr. Kezirian then claimed that the $100,000 deposit made on July 6, 2021 was not only for the $10,000 purchase of 610,000 shares of stock, but also for a $90,000 promissory note he executed payable by the WCRS to himself with interest. Dr. Kezirian never provided an executed promissory note to evidence this alleged debt.

**56.**

In sum, the audit revealed in May 2024 that Dr. Kezirian had never exercised the alleged option in the Organizational Consent. Specifically, he neither deposited funds nor executed a stock certificate or any other writing tending to evidence his exercise of the purported option and associated ownership of the stock. When asked, Dr. Kezirian did not provide any evidence whatsoever that he had even deposited funds into the WCRS account for the purported purchase of stock. Even to this day Dr. Kezirian has not provided an executed writing such as a subscription agreement, stock certificate, or the like, nor has he provided the requested proof that he ever deposited funds. Likewise, Dr. Kezirian has never provided an executed promissory note to show the alleged debt of $90,000 owed by the WCRS to Dr. Kezirian with interest. *See Exhibit 13*

*"Report of Auditor"*.

**57.**

None of these actions, including the Resolution of the Sole Incorporator, the Organizational Consent, the Promissory Note, nor the Side Letter, were disclosed to, discussed by, or approved by any Board Members, and the existence of these documents only came to light in May 2024 on discovery by Mr. Vollaro, the independent auditor.

**58.**

When confronted with the overwhelming evidence of his attempted deception, Dr. Kezirian refused to fully cooperate with the independent auditors, declined to answer questions, and refused to attend a Board meeting to explain his actions and review the documents. Instead, Dr. Kezirian abruptly and voluntarily resigned from his roles as Chairman of WCRS, Board member, and as a Board member of the WCRS-affiliated charity, the Visual Freedom Foundation on June 4, 2024. His resignation was unanimously accepted by the Board of the WCRS. *Exhibit 14*. Despite numerous attempts to communicate with Dr. Kezirian and offers for him to offer any mitigating explanations for his actions, he has remained stonily silent and has not responded meaningfully to any requests for information evidencing his execution of the option, payment of funds, or ownership of stock.

**59.**

Dr. Kezirian's plan the entire time had been to retroactively assert majority ownership, hoping that his actions would remain hidden long enough for him to gain control of WCRS without detection. Dr. Kezirian never intended to participate in the stock raise fairly but instead crafted a scheme to maintain control through secret stock options, delayed disclosures and defrauding shareholders in the two Private Placement Memorandums.

**60.**

If Dr. Kezirian's scheme succeeded, he would have effectively secured a majority of the WCRS for just $10,000, leaving the remaining shareholders with only a combined minority ownership despite their combined investment of $2.5 million. When a poll was conducted, not a single shareholder who responded was aware of Kezirian's alleged majority purchase. *See Exhibit 7; Exhibit 8.*

### 61.

Accordingly, based on these findings, the board of the WCRS resolved that Dr. Kezirian does not own any stock in WCRS because there is no evidence of a stock transaction having been completed. Further, there is no evidence of a promissory note having ever been executed. Consistent with this finding, accounting categorized the unlabeled deposit from July 6, 2021, as a contingent liability and proceeded to update the capital stock schedule with 93 shareholders and their respective contributions. Mr. Vollaro then issued his report, attached here as Exhibit 13, detailing his opinion on the WCRS Financial Statements for the year ending in December 2023.

### Count 1: Request for Declaratory Judgment

### 62.

The allegations of paragraphs 1 to 61 are hereby incorporated by reference and repeated in their entirety.

### 63.

Pursuant to the federal Declaratory Judgment statute, this Court has jurisdiction to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201.

### 64.

The Organizational Consent states in relevant part:

RESOLVED, FURTHER, that in consideration of $10,000 in cash paid to the Corporation by Guy Kezirian, such consideration being hereby determined, by and in the judgment of the Board of Directors, to be at least equal to the aggregate par value of such shares and to be adequate for the issuance thereof, the Corporation shall immediately issue six hundred ten thousand (610,000) shares of its Series B Common Stock to Guy Kezirian which shares shall be fully paid, nonassessable shares of Series B Common Stock;

RESOLVED, FURTHER, that the president and the Secretary of the Corporation be, and each of them hereby is, authorized, empowered and directed to execute, deliver and issue to Guy Kezirian, a stock certificate or certificates evidencing its ownership of six hundred ten thousand (610,000) shares of Series B Common Stock[.]

*Exhibit 1,* Organizational Consent, p. 2-3. Further, the Organizational Consent attached a form for the Certification of Stock, which includes a written form for the acknowledgement of receipt of payment and the assignment and transfer of the shares of stock from the corporation to the shareholder. *Exhibit 1*, Organizational Consent, p. 18-19 ("Exhibit B of the Organizational Consent).

## 65.

The above cited Organizational Consent purports to grant Dr. Kezirian an option to purchase 610,000 shares of stock and it contemplates two actions on behalf of Dr. Kezirian to accept the option: (1) the payment of the purchase price of $10,000 and (2) the issuance of a stock certificate or equivalent writing evidencing his stock ownership. *See Exhibit 1*, Organizational Consent, p. 18-19 ("Exhibit B of the Organizational Consent). To date, despite being asked multiple times, Dr. Kezirian has refused to provide any evidence of an executed stock certificate or any other writing evidencing a stock transfer, and has refused to provide any evidence of payment from Dr. Kezirian of any funds for any reason to the WCRS.

## 66.

Furthermore, the conclusion of the independent auditor who conducted the routine audit of WCRS's financial statements in May of 2024 was that there is no evidence that Dr. Kezirian has ever purchased any stock nor executed any promissory note in connection with the World College.

*See Exhibit 13.*

**67.**

Accordingly, this Court should issue a judgment declaring that Dr. Kezirian owns no stock in the WCRS and holds no promissory note or other debt instrument payable by the WCRS. As stated below, if Dr. Kezirian's actions have resulted in his ownership of 610,000 shares of stock or have resulted in his holding a promissory note for $90,000, then this would constitute fraud at the federal and state levels, breach of fiduciary duty, and breach of duty of care.

**Count 2: In the alternative, Misstatements and Omissions under the Exchange Act Section 10(b) and SEC Rule 10b-5**

**68.**

The allegations of paragraphs 1 to 67 are hereby incorporated by reference and repeated in their entirety.

**69.**

Under Section 10(b) of the Exchange Act, any individual who engages in fraudulent misconduct in connection with the purchase or sale of a security is liable to buyers of the securities who were affected by the alleged fraudulent actions. 15 U.S.C. §78j(b).

**70.**

If this Court finds that Dr. Kezirian owns 610,000 shares of stock in the WCRS and/or finds that Dr. Kezirian holds a promissory note payable by the WCRS, then Dr. Kezirian is also liable for securities fraud under Exchange Act Section 10(b) because his fraudulent actions, undertaken knowingly and recklessly in the purchase and sale of a security, have caused investors including the Plaintiff Visionaries to rely on his misrepresentations to their detriment, which has caused an economic loss to them.

**71.**

By engaging in the alleged conduct above, Dr. Kezirian directly or indirectly, in the connection with the sale of a security, and by use of means or instrumentality of state commerce, of the mail, or of the facilities of a national securities exchange, employed devices, schemes or artifices to defraud; and engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

**72.**

Dr. Kezirian was at all times completely motivated by his desire to serve his sole financial interests, with total disregard for the interests of the WCRS and the interests the investors, including the Plaintiff Visionaries.

**73.**

Specifically, Dr. Kezirian acted knowingly and recklessly in making material misrepresentations in the Private Placement Memorandums. He materially misstated in the Private Placement Memorandums in connection with the sale of shares of WCRS both the number of shares outstanding and also that the WCRS had no debt. He also concealed the fact that he had allegedly paid only $0.016 cents per share for Class B stock when the Plaintiff Visionaries and other purchasers of Class B stock paid $10 per share.

**74.**

Dr. Kezirian knowingly and purposefully concealed this information in order to deceive and defraud investors into believing that they were purchasing shares of stock in a company that did not yet have any debt and did not have a majority shareholder. Moreover, Dr. Kezirian knew that the Plaintiff Visionaries would never have agreed to purchase stock for a price 625 times greater than the price he paid, as the Plaintiff Visionaries were under the impression they would all receive the same opportunity. Dr. Kezirian knew this was wrong and that the Plaintiff

Visionaries and other investors would have valued their investments differently and likely not invested at all had they known that Dr. Kezirian had already purchased a majority of the shares of the company for approximately 625 times less per share than the rest of the purchasers of Class B stock paid or were expected to pay pursuant to the offering in the Trustee Private Placement Memorandum.

**75.**

The Plaintiff Visionaries relied on Dr. Kezirian's representations in the Trustee PPM and thereafter in making their investments. If the Court finds that Dr. Kezirian owns 610,000 shares of Class B stock, Plaintiff Visionaries have experienced an economic loss equivalent to the amount they and other investors overpaid for their shares of the company and also in the fact that their shares have less voting power than they thought because Dr. Kezirian is the majority shareholder. These losses were directly caused by the misrepresentations and omissions made by Dr. Kezirian. In Section 10(b) claims, "[o]ut-of-pocket losses are measured by the difference between the fair value of what the plaintiff received and the fair value of what the plaintiff would have received had there been no fraudulent conduct." *Bruschi v. Brown*, 876 F.2d 1526, 1531 (11th Cir. 1989)(citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155, 92 S.Ct. 1456, 1473, 31 L.Ed.2d 741 (1972)).

**76.**

The Supreme Court has recognized that "there is authority for allowing the § 10(b) plaintiff, at least in some circumstances, to choose between 'undoing the bargain (when events since the transaction have not made rescission impossible) or holding the defendant to the bargain by requiring him to pay [out-of-pocket] damages,' " *Bruschi*, 876 F.2d at 1531 (citing *Randall v. Loftsgaarden*, 478 U.S. 647, 662, 106 S.Ct. 3143, 3153, 92 L.Ed.2d 525 (1986)). Here, Plaintiff Visionaries are entitled to recission of their investment transactions, which they were fraudulently

induced to make.

**77.**

By engaging in the conduct described above, Kezirian violated and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 USC 78 j(b) and associated rules thereunder.

**Count 3: Additionally and in the alternative Breach of Agency Duty, Breach of Fiduciary Duty, and Breach of Duty of Care under Delaware Law**

**78.**

The allegations of paragraphs 1 to 77 are hereby incorporated by reference and repeated in their entirety.

**79.**

In the alternative to a declaratory judgment and in addition to the preceding allegations under Federal Securities Law, under Delaware Law, Dr. Kezirian had both a duty of care and a fiduciary duty to the WCRS and its shareholders as the sole board member of the WCRS at the time the PPMs were issued and investments solicited.

**80.**

By intentionally lying in the PPMs to conceal that he had allegedly purchased a majority stake, consisting of Class B stock, in the WCRS for an absurdly low price of only $0.016 per share as compared to the $10 per share the Plaintiff Visionaries and other shareholders paid, Dr. Kezirian breached his fiduciary duty to both the WCRS and the shareholders. His actions have enriched himself and have devalued the investments of the other shareholders. Further, the WCRS has been damaged by his completely self-serving actions, as its reputation has been damaged, it has lost more than $6,000,000 dollars of capital it could have raised by Dr. Kezirian's claimed shares being

sold at the proper $10 per share valuation, and its shares that have yet to be purchased by investors have been seriously devalued.

**81.**

Additionally, Dr. Kezirian has breached his agency and fiduciary duty to the Visionaries by deceiving them and misrepresenting to Greenberg Traurig that he was the sole person responsible for the WCRS, thus using that law firm as an unwitting instrumentality in his scheme to seize control of a company the Visionaries had worked together for years to form.

**82.**

The Plaintiff Visionaries have been damaged by Dr. Kezirian's breach of the agency and fiduciary duty he owed to them. Dr. Kezirian, under the guise of representing the interests of the Visionary Group, took advantage of their trust to claim a majority of the WCRS for himself, to his great enrichment and to the impoverishment of the Plaintiff Visionaries, who invested not only money but also years and countless hours of their time and efforts in developing the company. Dr. Kezirian's claimed shares would be worth $6,100,000 at the valuation the Plaintiff Visionaries paid per share, yet he claims to have only paid $10,000. Even if he had paid $100,000 for these shares, he would still have an advantage over the other investors of $6,000,000.

**Count 4: In the alternative, Unjust Enrichment Under Delaware Law**

**83.**

The allegations of paragraphs 1 to 82 are hereby incorporated by reference and repeated in their entirety.

**84.**

Dr. Kezirian, under the guise of representing the interests of the Visionary Group, took advantage of their trust to claim a majority of the WCRS for himself, to his great enrichment and

to the impoverishment of the Plaintiff Visionaries. Dr. Kezirian's claimed shares would be worth $6,100,000 at the valuation Plaintiffs paid. Further the WCRS has been impoverished by at least $6,090,000 in the amount of capital it could have raised from the sales of Dr. Kezirian's claimed stock at the proper valuation of $10 per share for Class B shares.

**85.**

Accordingly, if Dr. Kezirian keeps the 610,000 shares of stock he claims to own, he should be required to pay $6,090,000 to the WCRS, or the difference between the share price he should have paid ($10 per share) and the price he actually paid, with legal interest from the date of the original stock purchase.

**Count 5: In the alternative, Promissory Estoppel under Delaware Law**

**86.**

The allegations of paragraphs 1 to 85 are hereby incorporated by reference and repeated in their entirety.

**87.**

Under Delaware Law, Dr. Kezirian should be estopped from claiming 610,000 shares of class B stock in the WCRS, and should instead be limited to the number of shares he has actually paid for (if any) at a valuation of $10 per share of class B stock. Dr. Kezirian promised to faithfully represent the interests of the Visionary Group in incorporating the WCRS and coordinating the stock sales.

**88.**

The Visionaries reasonably expected Dr. Kezirian to carry out the duties he said he would based on their previous agreement: namely that there would be no majority shareholder, and the Visionaries would all be paying the same share price subject to the same limitations in the stock sale (i.e. $10 per share of Class B stock).

**89.**

The Plaintiff Visionaries reasonably relied on these promises, as they had worked with Dr. Kezirian for years and had no reason to believe he was orchestrating a scheme. The Plaintiff Visionaries therefore invested money in the WCRS to their detriment.

**90.**

Dr. Kezirian's promise to conduct the stock sale in accordance with the is binding because injustice can be avoided only by enforcement of the promise. Namely, Dr. Kezirian should be entitled only to the number of shares he has actually paid for, and at a $10 per share valuation, not the deeply discounted valuation he secretly attempted to grant himself. Accordingly, if Dr. Kezirian has paid $100,000 for stock in the WCRS, this should grant him 10,000 shares of Class B stock and not more.

**PRAYER**

WHEREFORE, after the due delays and necessary legal proceedings, Plaintiffs request that the Court enter judgment in their favor and against Dr. Kezirian:

A.    Recognizing and declaring that Dr. Kezirian owns no shares of stock in the WCRS;

B.    Recognizing and declaring that Dr. Kezirian holds no promissory note or other debt instrument payable by the WCRS;

C.    In the alternative, and upon presentation of any other grounds therefore, finding that Dr. Kezirian violated federal securities law and therefore owes damages to the WCRS and Plaintiff Visionaries;

D.    In the alternative, and upon presentation of any other grounds therefore, finding that Dr. Kezirian violated federal securities law and therefore Plaintiff Visionaries are entitled to recission of their investment transactions, which they were fraudulently induced to make;

E.    In the alternative, and upon presentation of any other grounds therefore, finding that Dr. Kezirian breached his duty of care, fiduciary duty, and duty of agency and therefore owes damages to the WCRS and Plaintiff Visionaries;

F.       In the alternative, and upon presentation of any other grounds therefore, that Dr. Kezirian has been unjustly enriched by his actions therefore owes damages to the WCRS and Plaintiff Visionaries;

G.       In the alternative, and upon presentation of any other grounds therefore, that Dr. Kezirian is bound by promissory estoppel and is entitled only to a maximum of 10,000 Class B shares of stock, provided that he submits proof of payment for same

H.       Ordering Dr. Kezirian to pay the costs and fees associated with this proceeding; and

I.       Awarding the WCRS and the Plaintiff Visionaries all such monetary damages, reimbursement of fees, and other relief to which they are legally entitled based upon the allegations above, the applicable law, and the evidence to be presented.

Respectfully submitted,

TAYLOR, PORTER, BROOKS & PHILLIPS L.L.P.

**By: /s/ Taylor Dunne**
Grant Willis, Bar #34820
John Stone Campbell III, Bar #23674
Taylor Dunne, Bar #39166
450 Laurel Street, 8th Floor (70801)
P.O. Box 2471
Baton Rouge, LA 70821-2471
Telephone:(225) 387-3221
Facsimile:(225) 346-8049
Email:          grant.willis@taylorporter.com
johnstone.campbell@taylorporter.com
taylor.dunne@taylorporter.com

Attorneys for World College of Refractive Surgery and Visual Sciences, Inc., Dr. Arthur Cummings, Dr. Charles Williamson, Dr. Osama Ibrahim, Dr. Ik Hee Ryu, Dr. Francesco Carones, and Dr. Dan Reinstein

CERTIFICATE

The undersigned hereby certifies that a copy of the foregoing has been sent by United States

mail, postage prepaid to the following:

Dr. Guy Kezirian
28071 North 90th Way
Scottsdale, Arizona 85262

Baton Rouge, Louisiana, this 18th day of November, 2024.


/s/ Taylor Dunne
Taylor Dunne